

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JOHN J. LAU** | § | |
| xxx-xx-6993 | § | Case No. 11-40284 |
| **and DEBORAH Y. LAU** | § | |
| xxx-xx-1436 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| PACIFIC ADDAX CO., INC. and | § | |
| TINA NOSEFF | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 11-4203 |
| | § | |
| JOHN J. LAU and | § | |
| DEBORAH Y. LAU | § | |
| | § | |
| Defendants | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint filed by the Plaintiffs, Pacific Addax Co., Inc. and Tina Noseff (the "Plaintiffs") seeking a determination of whether a respective debt owed to each of them by the Defendant-Debtors, John J. and Deborah Y. Lau ("Defendants"), is dischargeable, the Court issues the following findings of fact and conclusions of law. The Plaintiffs contend that the debt is nondischargeable under the alternative grounds set forth in 11 U.S.C. §523(a)(2)(A) and (a)(4).[1] After the trial, the Court took the matter under

---

[1] The Plaintiffs' complaint also sought to except the debts allegedly owing to each plaintiff as a debt arising from a willful and malicious injury pursuant to §523(a)(6). Those allegations were not addressed by the Plaintiffs at trial and were legally abandoned by its exclusion from the pre-trial order. *Kona Technology Corp. v. Southern Pacific Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) ["It is a well-

advisement.  This decision disposes of all issues pending before the Court.

## **FINDINGS OF FACT**

1.      The Debtor-Defendant, John J. Lau, was a managing member of JNC Partners, LLC ("JNC"), a company that was engaged in speculative real estate ventures through the procurement of option contracts on unimproved tracts of real property.

2.      The Debtor-Defendant, Deborah Y. "Debbie" Lau, was also a manager of JNC[2] and was active in its business operations.  She kept the books and records of JNC and participated at times in real estate and lending transactions as the attorney-in-fact for her husband, both individually and in his managerial capacity.[3]

3.      JNC attempted to compete against larger real estate acquisition companies by paying larger amounts in unrefundable earnest money deposits to potential sellers of large real estate tracts and by truncating the closing deadline to lure potential sellers to choose its offer.  While the option contract was pending, JNC would attempt to market particular parcels of the tract in order to determine the overall viability of the project.

4.      The Plaintiffs first met John Lau in 2005 through the Dallas chapter of the Hong Kong Economic Development Council.

5.      Edward C. "Eddie" Lee ("Lee"), the President of Plaintiff, Pacific Addax Co., Inc. ("Pacific Addax"), discussed investment opportunities in real property with John Lau.  Eventually, Lee's sister, Plaintiff, Tina Noseff, became interested in investment opportunities with Lau as well.

6.      Specifically, discussions between Lee and John Lau centered upon financial investments designated: (1) to assist in the acquisition of a 13.5-acre tract located

---

settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial."]; *see also Moser v. Mullican (In re Mullican)*, 2008 WL 5191196 at *12 (Bankr. E.D. Tex., Sept. 30, 2008) [noting that "a claim or defense not raised in the pretrial order may be deemed waived, even if it appeared in the complaint"], *citing Elvis Presley Enterprises v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998).  Thus, the issues actually presented to the Court pertained to §523(a)(2)(A) and (a)(4).

[2] See Ex. D at p. "Lau 411" – "Certificate of Company Resolutions."

[3] *Id.*

on the northwest corner of Fannin and Tex. Hwy 121 in Melissa, Collin County, Texas (the "Melissa Property"); and (2) to further the development for sale of a tract of land composed of 1,898.19 acres, located south of Lake Ray Roberts in Denton County, Texas (the "Craver Ranch").

7.      On October 31, 2005, Pacific Addax invested $500,000 with JNC.

8.      On October 31, 2005, Tina Noseff invested $100,000 with JNC.

9.      At the time of these original investments by the Plaintiffs, they had no specific agreement with John Lau regarding the precise allocation of their respective investment amounts between the Melissa project and the Denton project.

10.      At the time of these original investments by the Plaintiffs, they had no specific agreement with John Lau regarding the identification of the particular organizational structure by which the Melissa Property would be acquired and held.

11.      However, these investments were solicited based upon John Lau's representations to the Plaintiffs that each would own an actual ownership percentage in each of the specific development projects.

12.      The Plaintiffs' original investments were clearly not tendered as a product of JNC's general program to raise capital for its investment activities by issuing unsecured promissory notes at high interest rates that were unrelated to a specific investment project.

13.      The Plaintiffs have failed to demonstrate by a preponderance of the evidence that their initial investments tendered for the acquisition of the Melissa Property were procured by either Defendant under circumstances constituting actual fraud.

14.      The Plaintiffs have failed to demonstrate that John Lau made representations to induce the initial investments from the Plaintiffs that were knowingly false at the time they were made or that were made for the purpose of deceiving the Plaintiffs.

15.      However, John Lau, as a managing member of JNC, accepted the $600,000 from the Plaintiffs, tendered for the specific purpose of acquiring an interest in the Melissa Property (in whatever form that materialized) as well as becoming investors in the Craver Ranch development which was actually owned by a limited liability company known as JNC Partners Denton, LLC ("JNC Denton").

16.     John Lau, as a managing member of JNC, agreed to hold the $600,000 invested by the Plaintiffs until such time as a specific allocation of the Plaintiffs' investments was determined so that JNC could then apply such amounts toward the Plaintiffs' fractional ownership of each particular property.

17.     John Lau, as a managing member of JNC, stood in a formal fiduciary relationship to the Plaintiffs under Texas law with regard to the application of the original investment amount of $600,000.00.

18.     John Lau, as a managing member of JNC, failed to account properly for the application and disposition of the Plaintiffs' original investment amount of $600,000.00 pursuant to the Plaintiffs' instructions.

19.     The failure of John Lau, as a managing member of JNC, to account properly for the application and disposition of the Plaintiffs' original investment amount of $600,000.00 pursuant to the Plaintiffs' instructions constituted a breach of fiduciary duty.

20.     The foregoing breach of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., was performed knowingly or constituted such an extreme departure from the standard of ordinary care required of a person in his position as to compel the conclusion that he consciously disregarded the risk that his actions and/or omissions would result in a breach of fiduciary duty.

21.     The foregoing breach of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., did not arise as a consequence of mere negligence or inadvertence.

22.     The failure of John Lau, as a managing member of JNC, to account properly for the precise application and disposition of the Plaintiffs' original investment amount of $600,000.00 pursuant to the Plaintiffs' instructions constituted a defalcation while acting in a fiduciary capacity.

23.     Deborah Lau, as a member and managing member of JNC, and as the acknowledged custodian of the books and records for JNC, was aware of the breach of fiduciary duty and defalcation by John Lau through JNC's receipt and improper disposition of the Plaintiffs' original investment amount of $600,000.00.

24.     Deborah Lau, as a member and managing member of JNC, and as an individual guarantor of JNC liabilities, knowingly retained the benefits from this breach of fiduciary duty and defalcation by John Lau regarding the application and disposition of the Plaintiffs' original investment amount.

25.     An agreement was eventually reached between the Plaintiffs and John Lau regarding the allocation of the Plaintiffs' investments into the two specific projects.

26.     Although the specific date that the allocation occurred is not revealed by the evidence presented, $420,000 of the Pacific Addax investment and $80,000 of the Tina Noseff investment were applied to the acquisition of interests in JNC Partners Denton, LLC which held title to the Craver Ranch.

*Melissa Fourteen, Ltd.*

27.     $80,000 of the $500,000 originally tendered to JNC by Pacific Addax in October 2005 was allocated toward the acquisition of the Melissa Property.

28.     $20,000 of the $100,000 originally tendered to JNC by Tina Noseff in October 2005 was allocated toward the acquisition of the Melissa Property.

29.     Thus, once the allocation was made, John Lau and Deborah Lau, as managing members of JNC, had the responsibility to apply the sum of $100,000 toward the acquisition of the Melissa Property.

30.     There is no evidence that the Plaintiffs' investments were utilized for the stated purpose.

31.     At the time of the investments, JNC had an existing contract for the purchase of the Melissa Property but the closing of that transaction had not yet occurred.

32.     With the Plaintiffs' consent, John Lau exercised sole discretion as to the creation of the specific type of organizational entity under which the Melissa Property was to be acquired, for which the Plaintiffs' funds were to be committed.

33.     At or about the time at which the acquisition of the Melissa Property was negotiated, John Lau elected to utilize a limited partnership vehicle to fulfill the promises made to the Plaintiffs.

34.     On or about July 14, 2006 – the same date that the Melissa tract was acquired –
        Melissa Fourteen, Ltd. was created.[4]

35.     JNC became the general partner (and "Managing General Partner") of Melissa
        Fourteen, Ltd.

36.     The Plaintiffs became limited partners in Melissa Fourteen, Ltd.[5]

37.     Pursuant to the Melissa Fourteen Limited Partnership Agreement, the expressly-
        stated purpose of Melissa Fourteen, Ltd. was to acquire, maintain and sell the 13.5
        acre tract of land located on the northwest corner of Fannin and Highway 121 in
        Melissa, Texas.[6]

38.     JNC, as the general partner of Melissa Fourteen, Ltd., was specifically authorized
        and directed "to consummate any transaction and to perform any and all necessary
        actions thereto."[7]

39.     Consistent with the representations made by John Lau to the Plaintiffs, the limited
        partnership agreement specifically provided that "Legal title to such Land shall be
        taken and held in the name of the Partnership."[8]

40.     On the same date, July 14, 2006, JNC acquired the Melissa Property.[9]

41.     However, John Lau, as a managing member of JNC, acquired the Melissa Property
        in the name of JNC, with funds secured from, among other sources, the execution
        of a $2.095 million promissory note to American First National Bank, the infusion
        of $550,000 by other investors, and JNC's own funds.

---

[4] Ex. B.  John Lau admitted, however, that the contribution and ownership calculations contained in Exhibit B to the Melissa Fourteen Limited Partnership Agreement were erroneous.

[5] JNC also dubiously attempted to describe the majority of its interest as a limited partnership interest.  Though skeptical of its validity, the Court need not evaluate the significance of this attempt.

[6] *Id.* at §1.04 and Ex. A. to that Agreement.

[7] *Id.* at §1.05.

[8] *Id.*

[9] Ex. D.

42.   The acquisition of the Melissa Property and the execution of the promissory note to American First National Bank by JNC was actually performed by Deborah Lau, as attorney-in-fact for John Lau, both in his individual and managerial capacities.[10]

43.   On July 14, 2006, JNC executed a deed of trust on the Melissa Property in favor of American First National Bank to secure its $2.095 million promissory note.

44.   On July 14, 2006, JNC procured a title insurance policy on the Melissa Property in its own name for its own benefit.

45.   Thus, contrary to the representations of John Lau to the Plaintiffs and the statements contained in the Melissa Fourteen Limited Partnership Agreement executed by Lau on that same date, the Melissa property was never purchased in the name of Melissa Fourteen, Ltd.

46.   John Lau, as the managing member of JNC, never conveyed the Melissa Property to Melissa Fourteen, Ltd.[11]

47.   No bank account was ever established by Melissa Fourteen, Ltd.

48.   The evidence clearly demonstrates that the Plaintiffs tendered their initial investments for the purpose of obtaining interests in the Melissa Property, without expectations as to what specific organizational structure would be used to hold those interests or to a specific allocation of funds to be made to the Melissa project.

49.   John Lau had no informal fiduciary relationship with either of the Plaintiffs.

50.   Deborah Lau had no informal fiduciary relationship with either of the Plaintiffs.

51.   Once John Lau, as a managing member of JNC Partners, LLC, elected to utilize a limited partnership vehicle to fulfill the promises made to the Plaintiffs with regard to the Melissa Property, he and JNC were bound by the rights, obligations and

---

[10] *Id.* The evidence does not reveal why Ms. Lau did not sign in her own managerial capacity.

[11] *See, e.g.*, Ex. EE - the 2006 federal income tax return for the limited partnership which referenced no ownership of land. The largest asset listed was an "investment in Melissa Rock Center, Ltd." of $2.396 million — an investment completely unknown to the Plaintiffs.

responsibilities attendant to those specific business organizations and the role that each played in them.[12]

52.    John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., stood in a formal fiduciary relationship to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

53.    John Lau and Deborah Lau, as managing members of JNC Partners, LLC, which was the managing general partner of Melissa Fourteen, Ltd., never accounted to the Plaintiffs for the actual disposition of the $100,000 tendered to JNC by the Plaintiffs.

54.    John Lau, as a managing member of JNC Partners, LLC, the managing general partner of Melissa Fourteen, Ltd., fraudulently appropriated for JNC's use and benefit the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property.

55.    The failure of John Lau as a managing member of the managing general partner of Melissa Fourteen, Ltd., to account for the $100,000.00 tendered to him by the Plaintiffs for the benefit of Melissa Fourteen, Ltd. constituted a breach of his fiduciary duty to the limited partnership and its limited partners.

56.    The fraudulent appropriation of the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., constituted a breach of his fiduciary duty to the limited partnership and its limited partners.

57.    The foregoing breaches of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., were performed knowingly or constituted such extreme departures from the standard of ordinary care required of a person in his position as to compel the conclusion that he consciously disregarded the risk that his actions and/or omissions would result in a breach of fiduciary duty.

---

[12] Of course, the idea proffered by the Defendants that they cannot be liable for fraud or for breach of fiduciary duty because they lost considerably more money than the Plaintiffs is ludicrous. They chose to solicit investors for their various real estate activities. They solicited these Plaintiffs to obtain interests in specific entities under their managerial control. They are, therefore, responsible for any failure to maintain proper conduct in the management of those entities.

58. The foregoing breaches of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., did not arise as a consequence of mere negligence or inadvertence.

59. The fraudulent appropriation of the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., constituted a defalcation.

60. The fraudulent appropriation of the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., constituted an act of fraud while acting in a fiduciary capacity as to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

61. The fraudulent appropriation of the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., constituted a defalcation while acting in a fiduciary capacity as to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

62. Deborah Lau, as a member and managing member of JNC, and as the acknowledged custodian of the books and records for JNC, was aware of the breach of fiduciary duty and defalcation by John Lau regarding the $100,000.00 designated by the Plaintiffs for the acquisition of an interest in the Melissa Property because she knew that JNC had retained and utilized those sums for its own purposes.

63. Deborah Lau, as a member and managing member of JNC, and as an individual guarantor of JNC liabilities, knowingly retained the benefits from this breach of fiduciary duty and defalcation by John Lau regarding the use and benefit of the $100,000 tendered by the Plaintiffs for the Melissa Property.

64. Among the fiduciary duties that John Lau owed to Melissa Fourteen, Ltd. and its limited partners was to ensure the conveyance of the Melissa Property to the limited partnership in order to fulfill its stated purpose.

65. The failure of John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., to acquire title of the Melissa Property in the name of Melissa Fourteen, Ltd., or to convey title of the Melissa Property to Melissa

**Page 9 of 51**

Fourteen, Ltd. after its acquisition, constituted a breach of his fiduciary duty to the limited partnership and its limited partners.

66.   The foregoing breach of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., was performed knowingly or constituted such an extreme departure from the standard of ordinary care required of a person in his position as to compel the conclusion that he consciously disregarded the risk that his actions and/or omissions would result in a breach of fiduciary duty.

67.   The foregoing breach of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., did not arise as a consequence of mere negligence or inadvertence.

68.   The failure of John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., to acquire title of the Melissa Property in the name of Melissa Fourteen, Ltd., or to convey title of the Melissa Property to Melissa Fourteen, Ltd. after its acquisition, constituted a defalcation while acting in a fiduciary capacity as to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

69.   Deborah Lau, as a member and managing member of JNC, was aware of the breach of fiduciary duty and defalcation by John Lau regarding the failure to acquire title to the Melissa Property in the name of Melissa Fourteen, Ltd. because she personally handled and supervised the acquisition of the Melissa Property in the name of JNC and the granting of liens thereon for JNC's benefit.

70.   Deborah Lau, as a member and managing member of JNC, was aware of the breach of fiduciary duty and defalcation by John Lau regarding the failure to convey title to the Melissa Property to Melissa Fourteen, Ltd. after its acquisition because she knew that JNC retained title to the Melissa Property after the creation of Melissa Fourteen, Ltd.

71.   Deborah Lau, as a member and managing member of JNC, and as an individual guarantor of JNC liabilities, knowingly retained the benefits from this breach of fiduciary duty and defalcation by John Lau regarding the retention of title to the Melissa Property in the name of JNC and the failure to convey title to the Melissa Property to Melissa Fourteen, Ltd.

72.   In April 2007, John Lau as a managing member of the managing general partner of Melissa Fourteen, Ltd., issued a capital call to each Plaintiff, demanding the

infusion of additional capital based upon an "investment summary" issued in the name of Melissa Fourteen, Ltd. based upon the proportionate interests which the Plaintiffs held in that entity.[13]

73.    That April 2007 "investment summary" referenced "Melissa 13.5 AC," an investment date for the Plaintiffs of 10/31/2005; a "Project Purchase Date" of 7/14/2006, and an "Initial Project Cost" of $2.3 million.[14]

74.    The April 2007 "investment summary" calculations were based upon the servicing of the loan that JNC had executed with American First National Bank in July 2006.

75.    Believing erroneously that the limited partnership owned the Melissa Property, and believing that there was a need to provide financial support for the limited partnership in order to service the debt on the property, the Plaintiffs responded promptly to the capital calls.

76.    On April 27, 2007, Pacific Addax made an additional investment of $22,522.90 in Melissa Fourteen, Ltd.

77.    On that same date, Noseff made an additional investment of $5,630.72 in Melissa Fourteen, Ltd.

78.    Those investments were tendered to John Lau in April 2007 as a managing member of the managing general partner of Melissa Fourteen, Ltd.

79.    John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., diverted these April 2007 capital infusions at his whim and discretion for his own business purposes and those of JNC Partners, LLC.

80.    At the time he issued the April 2007 capital calls in the name of Melissa Fourteen, Ltd., John Lau knew that the Melissa Property was not owned by Melissa Fourteen, Ltd.

81.    At the time he issued the April 2007 capital calls in the name of Melissa Fourteen, Ltd., John Lau knew that Melissa Fourteen, Ltd. had no actual financial obligation with regard to the indebtedness to American First National Bank upon which he and Deborah Lau were guarantors.

---

[13]  Ex. E.

[14]  *Id.*

82.    In his issuance of the April 2007 capital calls in the name of Melissa Fourteen,
       Ltd., John Lau, as a managing member of the managing general partner of Melissa
       Fourteen, Ltd., represented to the Plaintiffs that Melissa Fourteen, Ltd. owned the
       Melissa Property.

83.    In his issuance of the April 2007 capital calls in the name of Melissa Fourteen,
       Ltd., John Lau, as a managing member of the managing general partner of Melissa
       Fourteen, Ltd., represented to the Plaintiffs that Melissa Fourteen, Ltd. owed an
       indebtedness secured by the Melissa Property.

84.    John Lau, as a managing member of the managing general partner of Melissa
       Fourteen, Ltd., knew that the foregoing representations contained in the April 2007
       capital calls for Melissa Fourteen, Ltd. were false when they were made.

85.    John Lau, as a managing member of the managing general partner of Melissa
       Fourteen, Ltd., made the foregoing false representations to the Plaintiffs with the
       intention of deceiving them and inducing them to comply with the capital calls.

86.    Any denial by John Lau regarding the existence of any fraudulent intent on his part
       with regard to his issuance of the April 2007 capital calls for Melissa Fourteen,
       Ltd. is not credible.

87.    In the absence of the false representations, the Plaintiffs would not have tendered
       funds to JNC in response to the April 2007 capital calls for Melissa Fourteen, Ltd.

88.    The Plaintiffs each actually and justifiably relied upon the false representations of
       John Lau in tendering funds to him in response to the April 2007 capital calls for
       Melissa Fourteen, Ltd.

89.    Plaintiff Pacific Addax suffered a financial loss of $22,522.90 as a direct and
       proximate cause of that reliance.

90.    Plaintiff Tina Noseff suffered a financial loss of $5,630.72 as a direct and
       proximate cause of that reliance.

91.    Deborah Lau, as a member and managing member of JNC, and as an individual
       guarantor of JNC liabilities, knowingly retained the benefits from these false
       representations by John Lau regarding the April 2007 capital calls for Melissa
       Fourteen, Ltd. by the increase of cash in the hands of JNC and her control thereof.

92.  The actions of John Lau in diverting the funds intended for the use and benefit of Melissa Fourteen, Ltd. constituted an embezzlement from the limited partnership, — not an embezzlement from the limited partners themselves.

93.  In February 2009, John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., again issued a capital call to each Plaintiff, again demanding the infusion of additional capital.  It again based the capital demand upon the same "investment summary" format that it had utilized earlier which was again issued in the name of Melissa Fourteen, Ltd.[15]

94.  Believing again in error that Melissa Fourteen, Ltd. owned the Melissa Property and that there was a need to provide financial support for the limited partnership to service the debt on the property, the Plaintiffs responded promptly to the February 2009 capital calls.

95.  On February 12, 2009, Pacific Addax made a further investment of $4,011.42 in Melissa Fourteen, Ltd..

96.  On that same date, Noseff made a further investment of $1,002.86 in Melissa Fourteen, Ltd.

97.  Those investments were tendered to John Lau and JNC in February 2009 as a managing member of the managing general partner of Melissa Fourteen, Ltd.

98.  John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., diverted these February 2009 capital infusions at his whim and discretion for his own business purposes and those of JNC Partners, LLC.

99.  At the time he issued the February 2009 capital calls in the name of Melissa Fourteen, Ltd., John Lau knew that the Melissa Property was not owned by Melissa Fourteen, Ltd.

100.  At the time he issued the February 2009 capital calls in the name of Melissa Fourteen, Ltd., John Lau knew that Melissa Fourteen, Ltd. had no actual financial obligation with regard to the indebtedness to American First National Bank upon which he and Deborah Lau were guarantors.

---

[15] Ex. F.

101. In his issuance of the February 2009 capital calls in the name of Melissa Fourteen, Ltd., John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., represented to the Plaintiffs that Melissa Fourteen, Ltd. owned the Melissa Property.

102. In his issuance of the February 2009 capital calls in the name of Melissa Fourteen, Ltd., John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., represented to the Plaintiffs that Melissa Fourteen, Ltd. owed an indebtedness secured by the Melissa Property.

103. John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., knew that the foregoing representations contained in the February 2009 capital calls for Melissa Fourteen, Ltd. were false when they were made.

104. John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., made the foregoing false representations to the Plaintiffs with the intention of deceiving them and inducing them to comply with the capital calls.

105. Any denial by John Lau regarding the existence of any fraudulent intent on his part with regard to his issuance of the February 2009 capital calls is not credible.

106. In the absence of the false representations, the Plaintiffs would not have tendered funds to John Lau and JNC in response to the February 2009 capital calls for Melissa Fourteen, Ltd.

107. The Plaintiffs each actually and justifiably relied upon the false representations of John Lau in tendering funds to him in response to the February 2009 capital calls for Melissa Fourteen, Ltd.

108. Plaintiff Pacific Addax suffered a financial loss of $4,011.42 as a direct and proximate cause of that reliance.

109. Plaintiff Tina Noseff suffered a financial loss of $1,002.86 as a direct and proximate cause of that reliance.

110. Deborah Lau, as a member and managing member of JNC, and as an individual guarantor of JNC liabilities, knowingly retained the benefits from these false representations by John Lau regarding the February 2009 capital calls for Melissa Fourteen, Ltd. by the increase of cash in the hands of JNC and her control thereof.

**Page 14 of 51**

111.　John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., fraudulently appropriated the $33,167.90 collectively tendered to JNC by the Plaintiffs in response to the two capital calls issued for the benefit of Melissa Fourteen, Ltd.

112.　The failures of John Lau as a managing member of the managing general partner of Melissa Fourteen, Ltd., to account for the $33,167.90 collectively tendered to JNC by the Plaintiffs for the benefit of Melissa Fourteen, Ltd. constituted breaches of his fiduciary duty to the limited partnership and its limited partners.

113.　Those breaches of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., were performed knowingly or constituted such extreme departures from the standard of ordinary care required of a person in his position as to compel the conclusion that he consciously disregarded the risk that his actions and/or omissions would result in a breach of fiduciary duty.

114.　Those breaches of fiduciary duty by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., did not arise as a consequence of mere negligence or inadvertence.

115.　The fraudulent appropriation by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., of the $33,167.90 collectively tendered to JNC by the Plaintiffs in response to the two capital calls issued for the benefit of Melissa Fourteen, Ltd., constituted defalcations.

116.　The fraudulent appropriation by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., of the $33,167.90 collectively tendered to JNC by the Plaintiffs in response to the two capital calls issued for the benefit of Melissa Fourteen, Ltd., constituted acts of fraud while acting in a fiduciary capacity as to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

117.　The fraudulent appropriation by John Lau, as a managing member of the managing general partner of Melissa Fourteen, Ltd., of the $33,167.90 collectively tendered to JNC by the Plaintiffs in response to the two capital calls issued for the benefit of Melissa Fourteen, Ltd., constituted defalcations while acting in a fiduciary capacity as to Melissa Fourteen, Ltd. and to the Plaintiffs as its limited partners.

118.  Deborah Lau knew that JNC, as the managing general partner of Melissa Fourteen, Ltd., and John Lau, as a managing member of that managing general partner, had a fiduciary relationship to Melissa Fourteen, Ltd., and its limited partners.

119.  Deborah Lau was aware of the breaches of fiduciary duty and defalcations by John Lau regarding the $33,167.90 collectively tendered by the Plaintiffs in response to the two capital calls issued for the benefit of Melissa Fourteen, Ltd. because she knew that JNC had retained and utilized those sums for its own purposes in each instance.

120.  Deborah Lau, as a member and managing member of JNC, and as an individual guarantor of JNC liabilities, knowingly retained the benefits from these breaches of fiduciary duty and defalcations by John Lau regarding the $33,167.90 collectively tendered by the Plaintiffs in response to the two capital calls issued for Melissa Fourteen, Ltd., and therefore knowingly participated in them.

121.  The total investment in Melissa Fourteen, Ltd. tendered by Pacific Addax was $106,534.32.

122.  The total investment in Melissa Fourteen, Ltd. tendered by Tina Noseff was $26,633.58.

123.  No accounting of the Plaintiffs' supposed investments in Melissa Fourteen, Ltd., whether initially or as a result of capital calls, has ever been provided by the Defendants.

124.  On or about March 25, 2009, JNC sold the Melissa Property to JESSH Enterprises, Inc. for $2.310 million which satisfied the JNC note to American First National Bank and released the Defendants from their underlying guaranty of that debt.

125.  The Plaintiffs were never aware during the relevant time period that the Melissa Property was not owned by Melissa Fourteen, Ltd.

126.  The Plaintiffs were not otherwise aware of the sale of the Melissa Property to JESSH Enterprises, Inc.

127.  The Plaintiffs received no return on their respective investments in Melissa Fourteen, Ltd.[16]

---

[16]  Stipulated fact from Art. V(B) on p. 4 of the approved Joint Pre-Trial Order ("PTO") entered in this adversary proceeding [dkt # 33] on March 28, 2013.

*JNC Partners Denton, LLC ("Craver Ranch")*

128.   In October 2005, John Lau and Deborah Lau, were the sole members of a Texas limited liability company known as JNC Partners Denton, LLC ("JNC Denton").[17]

129.   JNC Denton owned and sought to develop the Craver Ranch — a tract of land composed of 1,898.19 acres, located south of Lake Ray Roberts in Denton County, Texas.

130.   JNC Denton, under the sole control of the Defendants,[18] had pledged the Craver Ranch to secure the payment of a March 31, 2004 promissory note for $4.2 million to Mary Craver Denny, Trustee of the Lois Skiles Craver Family Trust and to JPMorgan Chase Bank, as Successor Trustee of the Kenneth Craver Family Trust.

131.   JNC Denton had also pledged the Craver Ranch to secure an additional $1.5 million promissory note dated March 31, 2004 to Liberty Bankers Life Insurance Company.

132.   Effective as of October 31, 2005, purportedly in exchange for $420,000 of the original $500,000 tendered to John Lau by Pacific Addax, the Defendants transferred a 9.87% interest in JNC Denton, LLC to Pacific Addax.[19]

133.   The transfer of the JNC Denton interest to Pacific Addax was executed by both John Lau and by Deborah Lau, each in their individual capacities and each as a Managing Member of JNC Denton.[20]

---

[17]   See Ex. J — Transfer of Interest Agreement — at p.4.

[18]   The evidence suggests that the Defendants had held JNC Denton and its Craver Ranch holdings "in house" until such time as the amount of debt service required by it and the JNC properties became excessive and forced the Defendants to seek additional investors.  Unfortunately, John Lau found it difficult to change the unilateral means by which he had utilized each piece of property (regardless of ownership structure) to address whatever immediate financial need might have arisen.

[19]   *Id.,* although the precise date of the allocation and the means by which the proportionate share of ownership was calculated is not revealed by the evidence.

[20]   *Id.* at p. 4.  This reference to Deborah Lau as a managing member is likely erroneous.  All other documentation offered in evidence throughout the relevant time period documents John Lau as the sole managing member of JNC Denton.

134.    The transfer of the JNC Denton interest to Pacific Addax granted it "all rights and privileges entitled to a Member of the Company."[21]

135.    The Defendants similarly transferred a 1.88% interest in JNC Denton to Tina Noseff, effective as of October 31, 2005, in purported exchange for an $80,000 purchase price.[22]

136.    The Plaintiffs did not investigate the existing debt structure of JNC Denton, but were prepared to assume their proportional share of the LLC's ongoing debt service.

137.    The Plaintiffs were not informed that the Craver Ranch was already subject to cross-collateralization of debts of other Lau-created entities.[23]

138.    The Defendants' prior use of the Craver Ranch for cross-collateralization purposes was a material fact.

139.    The Plaintiffs have failed to demonstrate by a preponderance of the evidence that the Defendants had actual knowledge that the Plaintiffs were unaware that the Craver Ranch was used to cross-collateralize debts owed by other Lau-created entities.

140.    Even if the Defendants were aware of the Plaintiffs' ignorance regarding that fact, the Plaintiffs had an equal opportunity to discover the cross-collateralization by performing due diligence through an examination of title records regarding Craver Ranch prior to making their investment.

---

[21]  *Id.* at §3.2.

[22]  Thus, this encompassed 80% of the original $100,000 tendered to John Lau by Tina Noseff. However, though the parties do not dispute that it occurred, no formal transfer agreement of an interest in JNC Denton to Tina Noseff was tendered in the documentary evidence in this case.

[23]  In November 2005, less than a month after the transfers to the Plaintiffs, John Lau, as manager of JNC Denton, pledged the assets of JNC Denton to secure an indebtedness of $5 million owed to Liberty Bankers Life Insurance Co. of which JNC Denton was only one of four obligors.  Though the Plaintiffs knew that JNC Denton had previously incurred indebtedness secured by its real property at the time that they obtained their interests, the evidence tendered to the Court fails to establish the degree to which this November 2005 transaction was simply a renewal of existing JNC Denton obligations or whether it constituted the accrual of additional debt and encumbrances that Lau was imposing upon JNC Denton for the benefit of other Lau-controlled entities in which the Plaintiffs had no interest in order to stabilize his own personal financial obligations.

**Page 18 of  51**

141.    The Plaintiffs admittedly elected to forego any opportunity to investigate the status of title regarding Craver Ranch.

142.    The Plaintiffs have failed to demonstrate by a preponderance of the evidence that their investments tendered for the acquisition of interests in JNC Denton were initially procured by either Defendant by false pretenses or by false representation.

143.    The Plaintiffs have failed to demonstrate by a preponderance of the evidence that their investments tendered for the acquisition of interests in JNC Denton were initially procured by either Defendant under circumstances constituting actual fraud.

144.    On the basis of Lau's prior successes in the Dallas commercial real estate field, the Plaintiffs did not closely monitor the activities of John Lau in his management of JNC Denton and the ongoing development of the Craver Ranch project in the first eighteen months of their involvement.

145.    John Lau, as the sole member-manager of JNC Denton, exercised complete control over the assets and activities of JNC Denton.

146.    The Plaintiffs were passive investors who were wholly dependent upon John Lau for any information regarding the operations of JNC Denton.

147.    Notwithstanding the fact that a complete restructuring of the secured indebtedness of JNC Denton had just occurred, with significant cash having been realized by the Defendants based upon the asserted equity in the Craver Ranch property,[24] John

---

[24]   The Plaintiffs place great emphasis on the alleged wrongdoings of the Defendants in this procurement of a $9.8 million loan in January 2006 from City Bank by which the secured indebtedness of JNC Denton was comprehensively restructured without the Plaintiffs' knowledge or consent.  Of understandably greater distress to them was the fact that $1.126 million was disbursed in March 2006 "to cash-out a portion of Borrower's equity in the Craver Ranch."  See Ex. N  – which documents that this was the actual "equity" amount received by JNC in lieu of the $1.054 million referenced in the loan agreement.  However, the $1.126 million in cash was not paid to the "Borrower"– JNC Denton.  It was paid instead to JNC Partners, LLC, which was owned solely by John and Deborah Lau.  Further, it was paid based upon a false certification to City Bank by John and Deborah Lau that they were the sole members of JNC Denton!  While this misconduct would likely have served as a basis for a nondischargeable claim of $132,300.20 against the Defendants for embezzlement of the Plaintiffs' proportionate share of the cash equity realized at that time by JNC Denton, neither Plaintiff sought the recovery of any funds arising from that equity liquidation.  The Court therefore need not further address this event since no judgment for such sums can be awarded.

Lau, as the managing member of JNC Denton, issued in April 2007 a capital call to both Plaintiffs, demanding the infusion of additional capital into JNC Denton pursuant to an "account investment summary" which was based upon the proportionate interests which each Plaintiff held in the entity.[25]

148.    That April 2007 capital call statement confirmed October 31, 2005 as the investment date for the Plaintiffs; referenced a valuation of "Craver Ranch" at $12.155 million; and reflected an outstanding loan balance of $7,900.750.00.[26]

149.    The April 2007 capital call statement concluded by demanding capital contributions of $300,098.91 from Pacific Addax based upon its 9.87% ownership interest and $57,161.70 from Noseff based upon her 1.88% interest.[27]

150.    In response to the April 2007 capital call, Pacific Addax promptly responded with an additional investment of $299,698.91 in JNC Denton.[28]

151.    In response to the April 2007 capital call, Noseff promptly responded with an additional investment of $57,161.70 in JNC Denton.

152.    Those investments were tendered to John Lau in April 2007 as the managing member of JNC Denton.[29]

153.    John Lau, as the managing member of JNC Denton, diverted these April 2007 capital infusions at his whim and discretion for his own business purposes and those of JNC Partners, LLC.

154.    At the time he issued the April 2007 capital calls in the name of JNC Denton, John Lau knew of the existence of the various cross-collateralization provisions and that

---

[25]  Ex. O.

[26]  *Id.*

[27]  *Id.*

[28]  The slight discrepancy in the amount paid by Pacific Addax is unexplained by the evidence tendered.

[29]  Section 9.1 of the Regulations of JNC Partners Denton, LLC required that "[c]apital contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company." Ex. I at p. 9.

the Craver Ranch stood as security for a number of debts that were not owed by JNC Denton.

155. In his issuance of the April 2007 capital calls in the name of JNC Denton, John Lau, as the managing member of the LLC, knew that his representations regarding the loan amounts secured by the Craver Ranch and the computations of equity purportedly held by the Plaintiffs in JNC Denton as set forth in the account investment summary were false when they were made.

156. John Lau, as the managing member of JNC Denton, made the foregoing false representations to the Plaintiffs with the intention of deceiving them and inducing them to comply with the capital calls.

157. Any denial by John Lau regarding the existence of any fraudulent intent on his part with regard to his issuance of the April 2007 capital calls for JNC Denton is not credible.

158. In the absence of the false representations, the Plaintiffs would not have tendered funds to John Lau in response to the April 2007 capital calls for JNC Denton.

159. The Plaintiffs each actually and justifiably relied upon the false representations of John Lau in tendering funds to him in response to the April 2007 capital calls for JNC Denton.

160. Plaintiff Pacific Addax suffered a financial loss of $299,698.91 as a direct and proximate cause of that reliance.

161. Plaintiff Tina Noseff suffered a financial loss of $57,161.70 as a direct and proximate cause of that reliance.

162. Deborah Lau, as a managing member of JNC and an individual guarantor of JNC liabilities, knowingly retained the benefits from these false representations by John Lau regarding the April 2007 capital calls for JNC Denton by the increase of cash in the hands of JNC and her control thereof.

163. The actions of John Lau in diverting the funds intended for the use and benefit of JNC Denton constituted an embezzlement from the limited liability company — not an embezzlement from the minority members themselves.

164. Without notice to the Plaintiffs, John Lau continued to utilize the Craver Ranch as collateral for promissory notes for the benefit of other entities in which he and his

wife were involved, with no notice to the Plaintiffs and no corresponding benefit for JNC Denton.[30]

165.    In February 2009, John Lau, as the managing member of JNC Denton, again issued a capital call to each Plaintiff, again demanding the infusion of additional capital.  It again based the capital demand upon a similar "investment summary" format that it had utilized earlier.[31]

166.    The February 2009 capital call statement again referenced $12.155 million as the value for Craver Ranch, against an outstanding loan balance of $7,900.750.00, thus representing the existence of an equity cushion of over $4 million.[32]

167.    In response to the February 2009 capital call, Pacific Addax promptly responded with an additional investment of $18,130.93 in JNC Denton.

168.    In response to the February 2009 capital call, Noseff promptly responded with an additional investment of $3,263.03 in JNC Denton.

169.    Those investments were tendered to John Lau in February 2009 as the managing member of JNC Denton.

170.    John Lau, as the managing member of JNC Denton, diverted these February 2009 capital infusions at his whim and discretion for his own business purposes and those of JNC Partners, LLC.

171.    At the time he issued the February 2009 capital calls in the name of JNC Denton, John Lau knew of the existence of the various cross-collateralization provisions and that the Craver Ranch stood as security for a number of debts that were not owed by JNC Denton.

---

[30] Ex. X and Y.  Though JNC Denton was already an obligor to Liberty Life on at least some of these "renewals," John Lau never accounted to the Plaintiffs for these transactions.  The Court does not address each of these transactions because the Plaintiffs did not present precise evidence on the degree of damage they suffered by each of these subsequent actions.  This may be due to the fact that the parties stipulated that, to the degree to which the Plaintiffs establish that their claims are nondischargeable, the amount of such nondischargeable claim shall be considered liquidated by the amount of the investment in the particular entity involved.  Stipulated fact — PTO Art. V(C) at p. 5 and Agreed Issue of Law — PTO Art. VI at p. 6.

[31] Ex. Z.

[32] *Id.*

172.     In his issuance of the February 2009 capital calls in the name of JNC Denton, John Lau, as the managing member of the LLC, knew that his representations regarding the loan amounts secured by the Craver Ranch and the computations of equity held by the Plaintiffs in JNC Denton as set forth in the account investment summary were false when they were made.

173.     John Lau, as the managing member of JNC Denton, made the foregoing false representations to the Plaintiffs with the intention of deceiving them and inducing them to comply with the capital calls.

174.     Any denial by John Lau regarding the existence of any fraudulent intent on his part with regard to his issuance of the February 2009 capital calls for JNC Denton is not credible.

175.     In the absence of the false representations, the Plaintiffs would not have tendered funds to John Lau in response to the February 2009 capital calls for JNC Denton.

176.     The Plaintiffs each actually and justifiably relied upon the false representations of John Lau in tendering funds to him in response to the February 2009 capital calls for JNC Denton.

177.     Plaintiff Pacific Addax suffered a financial loss of $18,130.93 as a direct and proximate cause of that reliance.

178.     Plaintiff Tina Noseff suffered a financial loss of $3,263.03 as a direct and proximate cause of that reliance.

179.     Deborah Lau, as a managing member of JNC and an individual guarantor of JNC liabilities, knowingly retained the benefits from these false representations by John Lau regarding the February 2009 capital calls for JNC Denton by the increase of cash in the hands of JNC and her control thereof.

180.     John Lau, as the managing member of JNC Denton, fraudulently appropriated the $378,254.57 collectively tendered to him by the Plaintiffs in response to the two capital calls issued for the benefit of JNC Denton.

181.     The failures of John Lau as the managing member of JNC Denton, to account for the $378,254.57 collectively tendered to him by the Plaintiffs for the benefit of JNC Denton, constituted breaches of his fiduciary duty to the limited liability company and its members.

**Page 23 of  51**

182.  Those breaches of fiduciary duty by John Lau, as the managing member of JNC
      Denton, were performed knowingly or constituted such extreme departures from
      the standard of ordinary care required of a person in his position as to compel the
      conclusion that he consciously disregarded the risk that his actions and/or
      omissions would result in a breach of fiduciary duty.

183.  Those breaches of fiduciary duty by John Lau, as the managing member of JNC
      Denton, did not arise as a consequence of mere negligence or inadvertence.

184.  The fraudulent appropriation by John Lau, as the managing member of JNC
      Denton, of the $378,254.57 collectively tendered to him by the Plaintiffs in
      response to the two capital calls issued for the benefit of JNC Denton constituted
      defalcations.

185.  The fraudulent appropriation by John Lau, as the managing member of JNC
      Denton, of the $378,254.57 collectively tendered to him by the Plaintiffs in
      response to the two capital calls issued for the benefit of JNC Denton constituted
      acts of fraud while acting in a fiduciary capacity as to the Plaintiffs as members of
      the LLC.

186.  The fraudulent appropriation by John Lau, as the managing member of JNC
      Denton, of the $378,254.57 collectively tendered to him by the Plaintiffs in
      response to the two capital calls issued for the benefit of JNC Denton constituted
      defalcations while acting in a fiduciary capacity as to the Plaintiffs as members of
      the LLC.

187.  Deborah Lau knew that her husband, as the managing member of JNC Denton, had
      a fiduciary relationship to JNC Denton and its members.

188.  Deborah Lau was aware of the breaches of fiduciary duty and defalcations by John
      Lau regarding the $378,254.57 collectively tendered by the Plaintiffs in response
      to the two capital calls issued for the benefit of JNC Denton because she knew that
      JNC had utilized those sums for its own purposes in each instance.

189.  Deborah Lau, as a member of JNC, and as an individual guarantor of JNC
      liabilities, knowingly retained the benefits from these breaches of fiduciary duty
      and defalcations by John Lau regarding the $378,254.57 collectively tendered by
      the Plaintiffs in response to the two capital calls issued for JNC Denton and,
      therefore, knowingly participated in them.

190.  Thus, the total investment in JNC Partners Denton, LLC tendered by Pacific
      Addax was $737,829.84.

191.   The total investment in JNC Partners Denton, LLC tendered by Tina Noseff was $140,424.73.

192.   The Craver Ranch was ultimately foreclosed upon by City Bank in May 2009 pursuant to its deed of trust for a foreclosure sale price of $9.8 million.[33]

193.   The Plaintiffs received no return on their respective investments in JNC Partners Denton, LLC.[34]

194.   Following the demand for satisfaction of the personal guaranties that each had issued to City Bank, the Defendants, John Lau and Deborah Lau, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court on January 28, 2011.

195.   On February 10, 2011, JNC Partners, LLC filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court.

196.   The claim of each Plaintiff was properly scheduled as an unsecured claim in the Defendant's bankruptcy case.[35]

197.   As of the Petition Date, Plaintiff, Pacific Addax, asserts a claim against the Defendants in the aggregate amount of $844,364.16 on account of its investments made in Melissa Fourteen, Ltd. and JNC Partners Denton, LLC.

198.   As of the Petition Date, Plaintiff, Tina Noseff, asserts a claim against the Defendants in the aggregate amount of $167,058.31 on account of her investments made in Melissa Fourteen, Ltd. and JNC Partners Denton, LLC.

199.   On October 31, 2011, the Plaintiffs filed their original complaint in this adversary proceeding, seeking a determination that the debt owed to each of them is nondischargeable under 11 U.S.C. §523(a)(2)(A), (a)(4), or (a)(6).[36]

200.   To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

---

[33]   Stipulated fact — PTO Art. V(C) at p. 5.

[34]   Stipulated fact — PTO Art. V(C) at p. 5.

[35]   Schedule F filed by the Debtors on February 18, 2011 [dkt #17] in case no. 11-40284.

[36]   *See supra* note 1 regarding the Plaintiffs' abandonment of the §523(a)(6) cause of action.

# CONCLUSIONS OF LAW

*Jurisdiction and Allocation of Judicial Power*

1.   This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523.  This Court has personal jurisdiction over the parties to this adversary proceeding.

2.   This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.   This Court has the authority to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case.  *Morrison v. Western Builders (In re Morrison)*, 555 F.3d 473, 478–79 (5th Cir. 2009).

4.   Such authority recognized in the Fifth Circuit is consistent with decisions of sister courts of appeal.  *See, e.g., Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir.1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991).

5.   The recognized authority of a bankruptcy court to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case was not impaired by the decision in *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).  *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 -313 (Bankr. N.D. Tex. 2011); *Dragisic v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011).

6.   Even if *Stern* had arguably impacted that authority [which it did not],

> the court would be compelled to follow existing Fifth Circuit precedent as set out in *Morrison* . . . as this court cannot ignore (much less 'overrule') existing binding circuit precedent, even if that precedent is thought to be inconsistent with a later decision by the Supreme Court. Only the circuit itself can overrule its own precedents.

*Christian v. Kim (In re Soo Bin Kim)*, 2011 WL 2708985, at *2 n.2 (Bankr. W.D. Tex., July 11, 2011), as cited in *Carroll*, 464 B.R. at 313 and *Dietz v.*

*Ford (In re Deitz)*,  469 B.R. 11, 21 (B.A.P. 9th Cir. 2012).

7.     The complaint filed by the Plaintiffs seeks a determination that the debt which they
       allege is owed to each of them by the respective Defendants should be excepted
       from discharge under 11 U.S.C. §523(a)(2)(A) and §523(a)(4).[37]

8.     In seeking to except the debts owing to them from the scope of the discharge
       granted to each Debtor-Defendant, the Plaintiffs assume the burden of proof under
       a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286
       (1991).

9.     All exceptions to discharge under §523 "must be strictly construed against a
       creditor and liberally construed in favor of a debtor so that the debtor may be
       afforded a fresh start."[38]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107
       F.3d 355, 356 (5th Cir. 1997).[39]

*Nondischargeability Under 523(a)(2)(A):  Debt Arising
by Fraud, False Pretenses, or False Representation*.

10.    The Plaintiffs' Complaint seeks a determination that the debt owed to each of them
       should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false
       pretenses, a false representation or actual fraud.

11.    11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

               a discharge under §727 of this title does not discharge an
               individual debtor from any debt for money, property, or
               services, ... to the extent obtained by false pretenses, a false
               representation, or actual fraud, other than a statement
               respecting the debtor's or an insider's financial condition.

---

[37]  *See supra* note 1 regarding the Plaintiffs' abandonment of the §523(a)(6) cause of action.

[38]  However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the
honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

[39]  The Fifth Circuit has noted that there are limits to the maxim that exceptions to
dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under
an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v.
M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir.
2001).

12.     Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[40] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

13.     The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].

14.     To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:

> (1) the debtor made representations;
> (2) at the time they were made the debtor knew they were false;
> (3) the debtor made the representations with the intention and purpose to deceive the creditor;
> (4) the creditor justifiably relied on such representation; and
> (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

---

[40]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

15.     A debt may also be declared non-dischargeable if it was obtained by false
        pretenses or by a false representation.  While "false pretenses" and "false
        representation" both involve intentional conduct intended to create and foster a
        false impression, the distinction is that a false representation involves an express
        statement, while a claim of false pretenses may be premised on misleading conduct
        without an explicit statement. *See FNFS, Ltd. v. Harwood (In re Harwood),* 404
        B.R. 366, 389 (Bankr. E.D. Tex. 2007); *Wallace v. Davis (In re Davis)*, 377 B.R.
        827, 834 (Bankr. E.D. Tex. 2007).

16.     In order for a debtor's representation to constitute a false pretense or a false
        representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2)
        describing past or current facts, (3) that [was] relied upon by the other party."[41]
        *RecoverEdge L.P.* at 1292-93; *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483
        (5th Cir. 1992); *see also In re Bercier*, 934 F.2d at 692 ["to be a false
        representation or false pretense under § 523(a)(2), the false representations and
        false pretenses must encompass statements that falsely purport to depict current or
        past facts"].

17.     All substantive aspects of § 523(a)(2)(A) are triggered by this complaint.

18.     To prevail on a claim for fraudulent misrepresentation under Texas law, the
        Plaintiffs are required to prove that: (1) a defendant made a material representation
        that was false; (2) the defendant knew that representation was false or made the
        representation recklessly without any knowledge of the truth; (3) the defendant
        intended to induce the plaintiff to act upon the representation; and (4) the plaintiff
        actually and justifiably relied upon the representation and thereby suffered injury.
        *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

19.     A knowing and fraudulent falsehood may also arise by nondisclosure when a party
        with a duty to disclose facts fails to do so. *Schlumberger Tech. Corp. v. Swanson*,
        959 S.W.2d 171, 181 (Tex.1997); cited in *Cronus Offshore, Inc. v. Kerr McGee
        Oil & Gas Corp.*,  369 F.Supp.2d 848, 858 (E.D. Tex. 2004).

---

[41]  Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance
required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance,
in addition to reliance in fact, is the correct level of reliance required to sustain a finding of
nondischargeability in a false pretense or false representation case.  *In re Hernandez*, 208 B.R. 872, 876
n.4 (Bankr. W.D. Tex. 1997).

20.    "Fraud by omission or non-disclosure is simply a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose."  *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex. App. – Houston [14th Dist.] 2004, pet. denied) *(citing Schlumberger,  959 S.W.2d at 181)*.

21.    The existence of such silence when there is a duty to speak may equate to a misrepresentation of material facts.  *Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 435 (Tex.1986); *Ho v. UT Arlington*, 984 S.W.2d 672, 691 (Tex. App. – Amarillo 1998, pet. denied).

22.    The failure to disclose a material fact when one has a duty to do so is sufficient to establish grounds for nondischargeability for fraud under § 523(a)(2)(A) of the Bankruptcy Code.  *Kleindienst v. Horne (In re Horne)*, 2011 WL 350473 at *7 (Bankr. W.D. Tex., Feb. 2, 2011); *Int'l Beauty Products, L.L.C. v. Beveridge (In re Beveridge),* 416 B.R. 552, 569-70 (Bankr. N.D. Tex. 2009); and cases cited therein.

23.    The elements of fraud by omission or non-disclosure under Texas law are: (1) the defendant conceals or fails to disclose a material fact within his knowledge to the plaintiff;[42] (2) the defendant knows that the plaintiff was ignorant of the fact and does not have an equal opportunity to discover the truth;[43] (3) the defendant intends to induce the plaintiff to take some action [or refrain from action] by concealing or failing to disclose the fact; and (4) the plaintiff suffers injury as a result of acting [or refraining from action] without that knowledge.  *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001); *Horizon Shipbuilding, Inc. v. Blyn II Holding, LLC,* 324 S.W.3d 840, 850 (Tex. App. – Houston [14th Dist.] 2010, no pet.) [expanded factors to include evaluation of duty to disclose]; *Siragusa v. Arnold*, 2013 WL 5462286, at *11 (N.D. Tex., Sept. 16, 2013).

---

[42]  Materiality exists if "disclosure of the fact would likely affect the conduct of a reasonable person concerning the transaction in question."  *Cnty. of El Paso, Tex. v. Jones*, 2009 WL 4730345 at *13-*14 (W.D. Tex., Dec. 4, 2009) (*citing Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 345 (Tex. App. – Fort Worth 2003, pet. denied))

[43]  The second element required to show fraud by omission "incorporates two requirements: (1) the defendant must be shown to have known that the plaintiff was ignorant of a material fact; *and* (2) the fact must be one that the plaintiff did not have an equal opportunity to discover."  *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 876 (Tex. App. – Austin 2006, pet. granted and remanded by agmt) (emphasis in original) (*citing Bradford*, 48 S.W.3d at 759).

24.     The existence of a duty to disclose is a question of law for the Court. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) *(citing Bradford*, 48 S.W.3d at 755).

25.     There is considerable confusion regarding whether *Bradford* conclusively established that a duty to disclose does not exist in Texas absent a confidential or fiduciary relationship.[44]  *See United Teacher Assoc. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 564-65 (5th Cir. 2005); *Highland Crusader Offshore Partners, L.P. v. Lifecare Holdings, Inc*., 2009 WL 1065212 at *5-6 (N.D. Tex., Apr. 21, 2009).

26.     After *Bradford*, the Fifth Circuit seemingly has embraced both positions.

27.     It has used a restrictive view of the duty to disclose. *Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372 (5th Cir. 2003) [limiting the duty to disclose only to fiduciary or confidential relationships].

28.     At other times a broader duty to speak has been recognized when, outside of a fiduciary or confidential relationship, a party voluntarily discloses some, but not all, material facts. *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 341 (5th Cir. 2008) ["A duty to disclose may arise where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue"]; *see also Rimade Ltd. v. Hubbard Enters., Inc*., 388 F.3d 138, 143 (5th Cir. 2004); *Lewis v. Bank of America, N.A.*, 347 F.3d 587 (5th Cir. 2003).

29.     Meanwhile, notwithstanding *Bradford*, Texas courts of appeals continue to recognize a duty to disclose in scenarios outside of a fiduciary or confidential

---

[44]  The perplexing language in *Bradford* reads as follows:

Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party make a partial disclosure that, although true, conveys a false impression.  The RESTATEMENT (SECOND) OF TORTS section 551 also recognizes a general duty to disclose facts in a commercial setting.  In such cases, a party does not make an affirmative misrepresentation, but what is said is misleading because other facts are not disclosed.  We have never adopted section 551. But even if we were to adopt such a general duty, there is no evidence to support the jury's liability finding under the submitted jury charge.

*Bradford*, 48 S.W.3d at 755-56.

relationship. *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. – Dallas 2010, pet. denied); *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App. – El Paso 2010, pet. denied); *Dewayne Rogers Logging, Inc. v. Propac Indus., Ltd.*, 299 S.W.3d 374, 391 (Tex. App. – Tyler 2009, pet. denied); *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670-71 (Tex. App. – Houston [14th Dist.] 2006, pet. denied); *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 486 (Tex. App. – Fort Worth 2004, no pet.); *Pellegrini v. Cliffwood– Blue Moon Joint Venture, Inc.*, 115 S.W.3d 577, 580 (Tex. App. – Beaumont 2003, no pet.).

30.    This expansive view as to when a duty to disclose might arise is recognized "in four circumstances: (1) a fiduciary or other special relationship between the parties give rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth." *Holland,* 338 S.W.3d at 598 (citing *Lesikar v. Rappeport*, 33 S.W. 3d 282, 298-99 (Tex. App. – Texarkana 2000, pet. denied)); *Tesoro Petroleum*, 217 S.W.3d at 670-71.

31.    Federal courts applying Texas law continue to use an expansive view of the duty to disclose as well. *Mora v. Koy,* 2013 WL 2289887, at *4 (S.D. Tex., May 23, 2013) [J. Miller]; *NuVasive, Inc. v. Renaissance Surgical Center North, L.P.*, 853 F.Supp.2d 654, 662-63 (S.D. Tex. 2012) [J. Ellison]; *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F.Supp.2d 623, 648 (S.D. Tex. 2009) [J. Rosenthal]; *Hidden Values, Inc. v. Wade*, 2012 WL 1836087 at *9 (N.D. Tex., May 18, 2012); *Experian Info. Solutions, Inc. v. Lexington Allen, L.P.*, 2010 WL 4026823 at *4 (E.D. Tex., Aug. 27, 2010).

32.    The degree of reliance otherwise required under §523(a)(2)(A) of the Bankruptcy Code is justifiable reliance. *Field v. Mans*, 516 U.S. 59, 70-71 (1995).

33.    "Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances." *First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467 B.R. 433, 443 (Bankr. W.D. Mich. 2012) (emphasis in original).

34.    "Justifiable reliance is a less demanding standard than reasonable reliance." *First American Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 186 (Bankr. W.D. Mo. 1999).

35.    Justifiable reliance does not require a plaintiff to demonstrate reasonableness nor

does it impose a duty to investigate unless the falsity is readily apparent. "Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard." *Guion v Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (*citing Field v. Mans*, 516 U.S. at 71).

36.    It incorporates "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases." *Field*, 516 U.S. at 70-71.

37.    "The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *Manheim Automotive Financial Svcs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005).

38.    However, a plaintiff "may not blindly rely upon a misrepresentation, the falsity of which would be obvious to the plaintiff had he or she used her senses to make a cursory examination or investigation.  Only where, under the circumstances, the facts should be apparent to a person of the plaintiff's knowledge or intelligence from a cursory glance, or where the plaintiff has discovered something that should serve as a warning that he is being deceived, is the plaintiff required to make an investigation of his own." *Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409, 423 (Bankr. N.D. Tex. 2006).

39.    "Justifiable reliance turns upon the plaintiff's own capacity and knowledge, or the knowledge with which the plaintiff may be fairly charged to have from the facts within his or her observation in light of his or her individual case." *Id.* (internal citation omitted).

40.    The Defendants had no duty to disclose to the Plaintiffs that the Craver Ranch was already subject to cross-collateralization of debts of other Lau-created entities.

41.    Even if a duty to disclose could be imposed upon the Defendants, they committed no fraud upon the Plaintiffs by omission or non-disclosure under Texas law because the Plaintiffs had an equal opportunity to discover the current state of title as to the Craver Ranch.

42.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, in the amount of $26,534.32, arising from the capital calls issued in the name of Melissa Fourteen, Ltd. is therefore excepted from discharge as a debt obtained by false representations pursuant to 11 U.S.C. §523(a)(2(A).

43. The portion of the debt owed by Defendant, John Lau, to Plaintiff, Tina Noseff, in the amount of $6,633.58, arising from the capital calls issued in the name of Melissa Fourteen, Ltd. is therefore excepted from discharge as a debt obtained by false representations pursuant to 11 U.S.C. §523(a)(2)(A).

44. The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, in the amount of $317,829.84, arising from the capital calls issued in the name of JNC Partners Denton, LLC is therefore excepted from discharge as a debt obtained by false representations pursuant to 11 U.S.C. §523(a)(2)(A).

45. The portion of the debt owed by Defendant John Lau to Plaintiff, Tina Noseff, in the amount of $60,424.73, arising from the capital calls issued in the name of JNC Partners Denton, LLC is therefore excepted from discharge as a debt obtained by false representations pursuant to 11 U.S.C. §523(a)(2)(A).

46. With regard to Defendant Deborah Lau, a debt may be determined to be non-dischargeable for fraud based upon a spouse's fraudulent conduct when imputed under agency principles based upon a business relationship between the spouses. *Tummel & Carroll v. Quinlivan (In re Quinlivan)* 434 F.3d 314, 318 (5th Cir. 2005); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992).[45]

47. The imputation of fraud for §523(a) nondischargeability purposes may be appropriate, notwithstanding the fact that a debtor-defendant may not have consented to the fraudulent acts, nor even had any knowledge or involvement in the fraud. *Id*. [referencing *Strang v. Bradner*, 114 U.S. 555, 561 (1885)].

48. "The test under section 523(a)(2)(A), however, is not whether the debtor actually procured the money, property, services or credit for him or herself. Rather, the Code dictates that a particular debt is nondischargeable *if the debtor benefits in some way* from the money, property, services or credit obtained through deception." *Luce,* 960 F.2d at 1283 (emphasis added; citations and internal quotations omitted).

49. As the Fifth Circuit stated in *Quinlivan*,

---

[45] However, it is true that any fraud perpetrated by one spouse cannot be properly imputed to the other spouse based <u>solely</u> upon the existence of a marital relationship. *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 Fed. App'x. 943, 945 (5th Cir. 2009).

> Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud. Holding the debtor accountable for his partner's [or agent's] fraud effectuates important state law policies regarding imputed liability. These state law policies create incentives for the debtor to control or monitor the conduct of his agent or partner. Even if the partner [or principal] is innocent of wrongdoing and had no knowledge or reason to know of the fraud, the debt is not dischargeable under §523(a)(2)(A).

434 F.3d at 319.

50.     "This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent. The relationship between the parties is analyzed under state law." *Id.*

51.     Under Texas law, "[a]n agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).

52.     "Apparent authority . . . is based on estoppel, arising either from a principal knowingly permitting an agent to hold himself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Id.*, *quoting Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998).

53.     Further, "[w]hether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to a principal . . . if the principal later ratifies the agent's conduct." *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 (Tex. App. – Houston [14th Dist.] 2003, no pet.).

54.     As one court noted,

> Ratification is the affirmance by a person of a prior act which when performed did not bind him, but which was professedly done on his account, whereby the act is given effect as if originally authorized by him. Ratification, in this context, is not a form of authorization, but a legal concept in agency law describing the relations between parties after affirmance by a

person of a transaction done or purported to be done for him.

*Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App. – San Antonio 1998, pet. dism'd w.o.j.), citing RESTATEMENT (SECOND) OF AGENCY §82 (1958).

55.   "A ratification will lie when the individual for whom an act was done retains the benefits of the transaction after acquiring full knowledge of the transaction." *Id.*

56.   While a ratification of a fraudulent act through retention of its benefits is not a form of agency authorization, its existence is sufficient to draw a debt within the scope of nondischargeability under §523(a)(2)(A) as a debt obtained by fraud because, after the ratification of the fraudulent act, the debtor benefits from the money "obtained through deception." *Luce*, 960 F.2d at 1283.

57.   In light of her status as a member and managing member of JNC Partners, LLC along with her husband, John Lau, and as a party who consistently ratified the fraudulent acts of her husband by knowingly retaining and utilizing the benefits derived by her JNC partner, Deborah Lau is equally liable to the respective Plaintiffs for the indebtedness obtained by her partner's false representations and such liability is excepted from her discharge as a debt obtained by false representations pursuant to 11 U.S.C. §523(a)(2)(A).  *Luce*, 960 F.2d at 1283.

*Nondischargeability Under §523(a)(4):*
*Debt Arising from Fraud or Defalcation*
*in a Fiduciary Capacity, Embezzlement or Larceny.*

*Fraud or Defalcation in a Fiduciary Capacity*

58.   The Plaintiffs' Complaint seeks a determination that the debt owed to each of them should be excepted from discharge under §523(a)(4).

59.   11 U.S.C. §523(a)(4) states that:

(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(4) for fraud or defalcation while acting in a fiduciary capacity,  embezzlement, or larceny.

60.  The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied,* 526 U.S. 1016 (1999) (internal quotations omitted).

61.  Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law. *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

62.  However, "state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

63.  The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law.  Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts.  The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong.  Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).
>
> . . . Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4).  It is not enough, however, that a statute purports to create a trust:  A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary."  Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

64.  Thus, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610

F.2d 1335, 1338 (5th Cir. 1980).

65.  "[T]he Fifth Circuit recognizes that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993)).

66.  Thus, federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are nondischargeable." *Gupta*, 394 F.3d at 350.

*Fiduciary Relationships*

67.  There are two general categories of fiduciary relationships recognized under Texas law.

68.  One category is a formal fiduciary relationship that arises as a matter of law, and includes relationships between attorney and client, principal and agent, partners, and joint venturers. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002).

69.  The term "fiduciary" refers to a person owing a duty of integrity and fidelity, and "it applies to any person who occupies a position of peculiar confidence towards another." *Kinzbach Tool Co. v. Corbett–Wallace Corp*., 138 Tex. 565, 160 S.W.2d 509, 512 (1942).

70.  "Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Id.*

71.  A second category under which a fiduciary capacity is recognized under Texas law is an informal fiduciary relationship or a "confidential relationship" that may arise from moral, social, domestic, or personal relationships in which one person trusts in and relies on another. *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171, 176 (Tex.1997); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp*., 823 S.W.2d 591, 594-95 (Tex. 1992); *superseded by statute on other grounds as noted in Subaru of Am. Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-

26 (Tex. 2002); *In re Estate of Abernethy*, 2012 WL 1943760, at * 4 (Tex. App.– El Paso, May 30, 2012).

72.     "A fiduciary relationship exists when the parties are under a duty to act or give advice for the benefit of another upon matters within the scope of the relationship." *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 544 (S.D. Tex. 2011) (*citing Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex. App. – Houston [1st Dist.] 1993, pet. denied)).

73.     Such a relationship "exists where a special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one placing confidence." *American Medical Intern., Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex. App.– Houston [14th Dist.] 1991, no pet.).

74.     "The law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Crim Truck,* 823 S.W.2d at 594, (*citing Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980)).

75.     "The effect of imposing a fiduciary duty is to require the fiduciary party to place someone else's interests above its own." *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.– Fort Worth 2011, no pet.).

76.     Accordingly, "a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required." *Giurintano*, 821 S.W.2d at 339; *Accord, Corral Group, Inc. v. Smic, Ltd. (In re Smic, Ltd)*, 2013 WL 4078704 at *9 (Bankr. N.D. Tex., Aug. 13, 2013) (*citing Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App. – Houston [14th Dist.] 1997, pet. denied)).

77.     Nevertheless, even without a formal escrow agreement, the receipt of money by a party accompanied by specific instructions with regard to the application of such funds creates a fiduciary duty independent of any contractual arrangement under Texas law. *City of Fort Worth v. Pippen*, 439 S.W.2d 660, 664-65 (Tex. 1969) [holding that, even when there is no formal escrow agreement, an agent who accepts money from a principal to be used for a specific purpose owes a fiduciary duty to the principal]; *Home Loan Corp. v. Texas American Title Co.*, 191 S.W.3d 728, 731 (Tex. App. – Houston [14th Dist.] 2006, pet. denied); *Newington, Ltd. v.*

*Forrester*, 2008 WL 4908200 at *3 (N.D. Tex., Nov. 13, 2008) [citing Texas authority to recognize tort claim in Rule 12(b)(6) context].

78.     The fiduciary duty recognized in *Pippen* and its progeny meets the express trust requirement under 11 U.S.C. §523(a)(4) as a trust-type obligation imposed pursuant to common law.

*Fiduciary Duty - Limited Partnerships*

79.     It is axiomatic under Texas law that a general partner of a limited partnership owes the highest of fiduciary duties to its limited partners.  *Graham Mortgage Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App. – Dallas 2010, no pet.); *Zinda v. McCann Street, Ltd.*, 178 S.W.3d 883, 890 (Tex. App. – Texarkana 2005, pet. denied).

80.     "Under Texas law, managing partners owe trust obligations to the partnership, having a duty of loyalty and due care as well as being under an obligation to discharge their duties in good faith and in reasonable belief that they are acting in the best interest of the partnership."  *McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009).

81.     "In a limited partnership, the general partner acting in complete control stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust." *Id*.

82.     "Included in the fiduciary duty which the trustee (general partner) owes to the beneficiaries (limited partners) is the duty of loyalty.  Not only is it his duty to administer the partnership affairs *solely* for the benefit of the partnership, he is not permitted to place himself in a position where it would be for his own benefit to violate this duty."  *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App.– Austin 1980, writ ref'd n.r.e.) (emphasis added).

83.     That fiduciary duty also encompasses a "duty of full disclosure of all matters affecting the partnership."  *Hughes v. St. David's Support Corp*., 944 S.W.2d 423, 425-26 (Tex. App. – Austin 1997, writ denied) [general partner in master limited partnership had fiduciary duty to limited partners to disclose sale (to itself) of partnership's interest in other operating partnerships].

84.     In other words, conduct of a general partner in a limited partnership "must be measured by standards exacting the utmost fidelity from a general partner who is in complete control of assets and affairs of a limited partnership." *Crenshaw,* 611 S.W.2d at 890 *(citing MacDonald v. Follett*, 142 Tex. 616, 180 S.W.2d 334 (1944)).

85.   Such trust-type obligations are imposed upon the managing partner even in a two-tiered partnership arrangement.  *Id.* [imposing fiduciary duties upon the managing partner of a managing partner of a limited partnership]; *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 712-13 (Bankr. N.D. Tex. 2011).

86.   The existence of such fiduciary duties, even in a two-tiered partnership arrangement, are well within the parameters of 11 U.S.C. §523(a)(4).  *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 781 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993) [finding individual managing partner of a limited partnership, which is the general partner of a second limited partnership, has a fiduciary duty to the second partnership]; *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011) [individual officer of corporate general partner of a limited partnership has independent fiduciary duty to that limited partnership due to degree of trust and confidence placed in him and the degree of control he exercised].

87.   As set forth in this Court's previous analysis of *Bennett*:

>   As a result of the control exercised by the debtor Bennett, who was the sole general partner of a limited partnership that, in turn, acted as the general partner for the affected limited partnership, the Circuit found that Bennett, as the sole individual with the power and authority to direct the affairs of the titular managing general partner of the limited partnership, owed a fiduciary duty under Texas law to the limited partners sufficient to meet the requirements of §523(a)(4).

  *Harwood*, 404 B.R. at 395.

88.   Thus, "Texas law applies these same [fiduciary] obligations where the managing partner stands in a two-tiered partnership structure as the managing partner of a managing partner."  *McBeth*, 565 F.3d at 177.

89.   As the managing member of the managing general partner of Melissa Fourteen, Ltd.,  John Lau stood in a fiduciary relationship with the limited partnership and its limited partners.

*Fiduciary Duty - Limited Liability Companies*

90.   Texas permits the formation of a limited liability company.  3 TEX. BUS. ORGS. CODE ANN. §101.001, et.seq. (Vernon 2012).

91.    Generically, a limited liability company works like an incorporated partnership.
       The company provides protection from personal liability for business debts as in a
       corporation, while avoiding a second level of federal taxation on the company's
       earnings as enjoyed in a partnership.  *Shook v. Walden,* 368 S.W.3d 604, 613 (Tex.
       App.– Austin 2012, pet. denied).

92.    It also provides a wide flexibility in management structure, allowing the
       participants to craft much of the management duties and obligations for
       themselves.  It allows direct involvement and control by the members but also
       allows a corporate representative form of governance if the members choose to
       have the LLC governed by managers.  NICHOLAS KARAMBELAS, LIMITED
       LIABILITY COMPANIES:  LAW, PRACTICE AND FORMS §6.2 (2012).

93.    Thus, an LLC may be run by its members collectively, like a general partnership,
       or it may be run by one or more manager-members, like a limited partnership. See
       3 TEX. BUS. ORGS. CODE ANN. §101.251 (Vernon 2012).

94.    Accordingly, as was true with its predecessor, the Texas Limited Liability
       Company Act, Chapter 101 of the Texas Business Organizations Code does not
       directly address the duties owed by LLC managers and members. As revised, it
       provides:

              The company agreement of a limited liability company may
              expand or restrict any duties, including fiduciary duties, and
              related liabilities that a member, manager, officer, or other
              person has to the company or to a member or manager of the
              company.

       3 TEX. BUS. ORGS. CODE ANN. §101.401 (Vernon 2012).

95.    Thus, though the Texas statute governing limited liability companies implies that
       certain duties may be owed, it does not define any such duties, but rather allows
       the contracting parties to specify the breadth of those duties in the company
       agreement.

96.    Section 10.2 (8) of the Regulations of JNC Partners Denton, LLC endowed John
       Law, as the Manager-Member, with the power and authority to:

              to do all acts, take part in any proceedings, and exercise all
              rights and privileges as could an absolute owner of Company

> Property, subject to the limitations expressly stated in these
> Regulations *and the faithful performance of the Managers'*
> *fiduciary obligations to the Company and the Members.*[46]

97.     Thus, as the managing member of JNC Denton, John Lau stood in a fiduciary
relationship with the Plaintiffs as members of that LLC.

98.     The recognition of this fiduciary duty is consistent with the degree of control
exercised by John Lau as the managing member.  *See, e.g., Allen v. Devon Energy
Holdings, LLC*, 367 S.W.3d 355, 392-93 (Tex. App. – Houston [1st Dist.] 2012,
pet. granted, judgm't vacated w.r.m.).

*Defalcation*

99.     Until recently, a defalcation under §523(a)(4) in this circuit required the
establishment of a "willful neglect of duty" that was "essentially a recklessness
standard."  *Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 185 (5th Cir.
1997).

100.    Willfulness in that context had been "measured objectively by reference to what a
reasonable person in the debtor's position knew or reasonably should have
known."  *Harwood*, 637 F.3d at 624 (citing *Office of Thrift Supervision v. Felt (In
re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001)).

101.    However, the United States Supreme Court has recently rejected an objective
recklessness standard in favor of a heightened culpability standard for defalcation
in this context.

102.    In a unanimous decision in *Bullock v. BankChampaign, N.A.*, ___U.S.___, 133
S.Ct. 1754 (2013), issued on May 13, 2013, the Supreme Court declared that
"defalcation" for the purposes of §523(a)(4) "includes a culpable state of mind
requirement" involving "knowledge of, or gross recklessness in respect to, the
improper nature of the relevant fiduciary behavior."  *Id*. at 1757.

103.    According to *Bullock*, "where the conduct at issue does not involve bad faith,
moral turpitude, or other immoral conduct, the term [defalcation] requires an
intentional wrong." *Id*. at 1759.  Such an intentional wrong encompasses not only
conduct which the fiduciary knows is improper, but it also encompasses reckless
conduct, such as when a fiduciary "consciously disregards (or is willfully blind to)

---

[46] Ex. I at p. 13 (emphasis added).

a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty. *Id.*

104.   In seeking to require a higher degree of fault for a finding of a defalcation, similar to its "statutory neighbors" of fraud, embezzlement and larceny listed in §523(a)(4), without imposing an actual requirement of specific intent to establish a defalcation, the Supreme Court adopted a standard of recklessness "of the kind set forth in the Model Penal Code §2.02(2)(c)."[47]

105.   Acknowledging that its adoption of this heightened level of culpability for defalcation cases under §523(a)(4) had been recognized earlier in bankruptcy jurisprudence from the First and Second Circuit,[48] the Court further noted with approval that this "severe recklessness" standard tracks the showing required to demonstrate scienter in federal securities cases.[49]

106.   Utilizing the MPC definition of recklessness and analyzing the defalcation standard to scienter determinations in federal securities cases is an effort to exclude that type of recklessness arising as a consequence of mere negligence or inadvertence.

107.   As recognized in securities law cases in the Fifth Circuit, this type of "severe recklessness is limited to those highly unreasonable omissions or misrepresen-tations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers [of securities] which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

---

[47]   Model Penal Code §2.02(2)(c) states that:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(2)(c) (Thomson Reuters, Westlaw through 2012).

[48]   *See, e.g.*, *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2nd Cir. 2007).

[49]   Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).

108.    Thus, such a heightened culpability requirement will ensure that the "harsh sanction of non-dischargeability is reserved for those who exhibits some portion of misconduct."[50] *Hyman*, 502 F.3d at 68-69.

109.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, in the amount of $500,000.00 arising from the breach of fiduciary duty committed by John Lau to account properly for the precise application and disposition of the Plaintiffs' original investment amount is therefore excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

110.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, that was designated by such Plaintiff for the acquisition of an interest in the Melissa Property is therefore excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

111.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, in the amount of $26,534.32, arising from the capital calls issued to such Plaintiff in the name of Melissa Fourteen, Ltd. is therefore excepted from discharge as a debt as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

112.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Pacific Addax, in the amount of $317,829.84, arising from the capital calls issued to such Plaintiff in the name of JNC Denton is therefore excepted from discharge as a debt as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

113.    The portion of the debt owed by Defendant, John Lau, to Plaintiff, Tina Noseff, in the amount of $100,000.00 arising from the breach of fiduciary duty committed by John Lau to account properly for the precise application and disposition of the

---

[50]   In applying the heightened standard expressed in *Bullock* and in concluding that, even under that heightened standard, the Defendant has committed a defalcation under the circumstances of this case, the Defendant's conduct clearly constituted a "willful neglect of duty" and met the lower objective recklessness standard expressed in *Harwood* and *Schwager* to establish a defalcation. Because a defalcation is established under either analysis, the Court believes that it is proper to utilize the *Bullock* defalcation analysis in this context, notwithstanding its earlier recognition that only the circuit can overrule its own precedents.

Plaintiffs' original investment amount is therefore excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

114.   The portion of the debt owed by Defendant, John Lau, to Plaintiff, Tina Noseff, that was designated by such Plaintiff for the acquisition of an interest in the Melissa Property is therefore excepted from discharge as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

115.   The portion of the debt owed by Defendant, John Lau, to Plaintiff, Tina Noseff, in the amount of $6,633.58, arising from the capital calls issued to such Plaintiff in the name of Melissa Fourteen, Ltd. is therefore excepted from discharge as a debt as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

116.   The portion of the debt owed by Defendant, John Lau, to Plaintiff, Tina Noseff, in the amount of $60,424.73, arising from the capital calls issued to such Plaintiff in the name of JNC Denton is therefore excepted from discharge as a debt as a debt for a defalcation while acting in a fiduciary capacity and as a debt for fraud while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

117.   Under Texas law, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) *(citing Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942)).

118.   To establish a claim against a person for knowing participation in a breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship. *Id.* (*citing Kinzbach* and *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App. – Austin 2001, pet. denied)).

119.   In light of her knowledge of the existence of a fiduciary relationship between her husband, John Lau, and the Plaintiffs, and her knowing participation in the repeated breaches of fiduciary duty committed by her husband, all of which she ratified by knowingly retaining the benefits derived thereby, Deborah Lau is equally liable to the respective Plaintiffs for the indebtedness obtained by her partner's various defalcations and acts of fraud while acting in a fiduciary capacity

and such liability is therefore excepted from her discharge as well pursuant to 11
U.S.C. §523(a)(4).

*Embezzlement*

120.    "Embezzlement is defined for the purposes of §523(a)(4) as the fraudulent
appropriation of property by a person to whom such property has been entrusted,
or into whose hands it has lawfully come."  *Miller v. J.D. Abrams Inc. (Matter of
Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999).

121.    "Embezzlement, however, is not limited to situations in which one person is
entrusted with the property of another.  It also applies where . . . a person lawfully
obtains property, but then fraudulently appropriates it for his or her own use."
*Powers v. Caremark, Inc. (In re Powers)*, 261 Fed. Appx. 719, 723 (5th Cir. 2008).

122.    "Given that a debtor has lawful control of the property, embezzlement then
requires three elements: (1) appropriation of funds by the debtor; (2) for the
debtor's use or benefit; and (3) with fraudulent intent."  *Andra Group, L.P. v.
Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex.
2009) *(citing Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 200 (Bankr.
S.D. Tex. 2006)).

123.    Fraudulent intent is "an intent to deceive another person and thereby induce such
other person to transfer, alter or terminate a right with respect to property."  *Winn
v. Holdaway (In re Holdaway)*, 388 B.R. 767, 778 (Bankr. S.D. Tex. 2008);
*Soisson v. Hillebrandt (In re Hillebrandt)*, 2011 WL 2447738 at *20 (Bankr. S.D.
Miss., June 15, 2011).

124.    "Fraudulent intent may be inferred from the conduct of the Debtor and from
circumstances of the situation." *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 582
(Bankr. N.D. Tex. 2010).

125.    The claim for any debt arising from a manager's embezzlement of funds intended
for the use and benefit of a company would belong to that company, not to the
individual shareholders or members of that company.  *See, e.g., Guerriero v.
Kilroy (In re Kilroy)*, 354 B.R. 476, 494 (Bankr. S.D. Tex. 2006).

126.    The acquiescence of a debtor who benefitted from her spouse's embezzlement
from a company constitutes a ratification of her spouse's fraudulent conduct and
the liability arising therefrom is therefore nondischargeable under §523(a)(4).
*Farley v. Romano (In re Romano)*, 353 B.R. 738, 767 (Bankr. D. Mass. 2006).

127.  The only debt otherwise owed by either Defendant to either Plaintiff arising from embezzlement pertains to the conversion of the Plaintiffs' respective shares of the $1.126 million equity liquidation derived from JNC Denton through the auspices of the City Bank loan to that entity.

128.  However, neither Plaintiff sought the recovery of any debt from the Defendants in this adversary proceeding arising from that transaction.  Therefore, the Plaintiffs' request to except any debt owed to them by the Defendants as a debt arising from embezzlement must be denied.

*Larceny*

129.  Larceny is the wrongful taking and carrying away of the property of another with intent to convert such property to the taker's own use *without* the consent of the owner.  *See generally, S&S Food Corp. v. Sherali (In re Sherali)*, 490 B.R. 104, 124 (Bankr. N.D. Tex. 2013); *McDaniel v. Border (In re McDaniel),* 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994).

130.  "Both larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing.  Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care."  *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

131.  Because the Plaintiffs' invested funds were rightfully in the possession of the Defendants, there was no larceny committed by the Defendants under these facts.

132.  Thus, the Plaintiffs' request to except any debt owed to them by the Defendants as a debt arising from larceny must be denied.

*Attorney's Fees, Court Costs, and Interest*

133.  The Plaintiffs' request for a recovery of attorney's fees must be denied.

134.  In adherence to the so-called "American Rule," attorneys' fees are not taxable as costs or recoverable as damages in an adversary proceeding unless such fees are authorized by statute or through an enforceable contract between the parties.  *First United Bank & Trust v. Buescher (In re Buescher)*, 491 B.R. 419, 439 (Bankr. E.D. Tex. 2013); *Bell v. Claybrook (In re Claybrook),* 385 B.R. 842, 854 (Bankr. E.D. Tex. 2008).

135.    There is no federal statute that would authorize any award of attorney's fees to the Plaintiffs under these circumstances.

136.    As for recovery of attorney's fees under Texas law, Chapter 38 of the Texas Civil Practice and Remedies Code authorizes a recovery of attorney's fees in certain types of lawsuits, such as suits on a sworn account or an oral or written contract. See 2A Tex. Civ. Prac. & Rem. Code §38.001, et seq. (Vernon 2008).[51]

137.    The Plaintiffs have presented no written contract by and among the parties that authorizes a recovery of attorney's fees.

138.    Even if one were to construe the transactions as oral contracts by and among the parties, "[a] party seeking to recover attorney's fees [under Texas law] carries the burden of proof. Although courts should consider several factors when awarding attorney's fees, a short hand version of these considerations is that the trial court may award those fees that are "reasonable and necessary" for the prosecution of the suit." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991).

139.    The failure of the Plaintiffs to present actual evidence of the attorney's fees incurred, and to demonstrate the reasonable and necessary nature of such fees, further precludes the recovery of attorney's fees incurred in the prosecution of this adversary proceeding.

140.    Court costs of $250.00 incurred in this adversary proceeding are awarded to Pacific Addax, as a representative of both Plaintiffs, to be paid jointly and severally by the Defendants.

141.    The Plaintiffs are entitled to an award of pre-judgment interest on the respective judgment sums due and owing to each of them by the Defendants.

---

[51] Texas law provides that a party may recover reasonable attorney's fees on a claim based on an oral or written contract by complying with the following requirements: (1) the claimant must be represented by an attorney; (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered within thirty days of presentment. 2A Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (Vernon 2008). No particular form of presentment is required, and it may be written or oral. *See Harrison v. Gemdrill Intern., Inc.*, 981 S.W.2d 714, 719 (Tex.App.– Houston [1st Dist.] 1998, pet. denied) ["[A]ll that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim."].

**Page 49 of  51**

142.   In the absence of proof of any written notice of the claim issued by the Plaintiffs to the Defendants, accrual of pre-judgment interest shall begin on the date of the filing of the complaint in this adversary proceeding — October 31, 2011.

143.   Such pre-judgment interest shall accrue from October 31, 2011 until the date preceding the date of judgment at the rate of 5% per annum.[52]

144.   The Plaintiffs are entitled to post-judgment interest on their respective claims at a rate of 0.11%.  28 U.S.C. §1961.

## CONCLUSION

145.   Plaintiff, Pacific Addax Co., Inc., shall recover from the Defendants, John J. Lau and Deborah Y. Lau, jointly and severally, the principal sum of $844,364.16, plus pre-judgment interest in the amount of $84,783.42, for a total of $929,147.58, together with court costs of $250.00, and post-judgment interest upon all such sums at the current federal post-judgment interest rate of 0.11% until paid.

146.   All of the above-referenced indebtedness owed by Defendants, John J. Lau and Deborah Y. Lau, to Plaintiff, Pacific Addax Co., Inc., is hereby declared to be nondischargeable pursuant to 11 U.S.C. §523(a)(4).

147.   A portion of the aforementioned principal indebtedness owed by Defendants, John J. Lau and Deborah Y. Lau, to Plaintiff, Pacific Addax Co., Inc., consisting of the amount of $344,364.16, is also hereby declared to be nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

148.   Plaintiff, Tina Noseff, shall recover from the Defendants, John J. Lau and Deborah Y. Lau, jointly and severally, the principal sum of $167,058.31, plus pre-judgment interest in the amount of $16,774.48, for a total of $183,832.79, together with post-judgment interest upon such sums at the current federal post-judgment interest rate of 0.11% until paid.

149.   All of the above-referenced indebtedness owed by Defendants, John J. Lau and Deborah Y. Lau, to Plaintiff, Tina Noseff, is hereby declared to be

---

[52] *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex. 1998); 3 TEX. FIN. CODE ANN. §304.104 (Vernon 2006)[regarding date of accrual]; 3 TEX. FIN. CODE ANN. §§ 304.003 & 304.103 (Vernon 2006)[interest rate].

nondischargeable pursuant to 11 U.S.C. §523(a)(4).

150. A portion of the aforementioned principal indebtedness owed by Defendants, John J. Lau and Deborah Y. Lau, to Plaintiff, Tina Noseff, consisting of the sum of $67,058.31, is also hereby declared to be nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

151. All other relief requested in the Plaintiffs' Complaint in the above-referenced adversary proceeding shall be denied.

152. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

153. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 11/04/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE